UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DOMINION LIQUID TECHNOLOGIES, LLC,             Case No. 1:11-cv-444
          Plaintiff,
                                               Litkovitz, M.J.
     vs.

GT BEVERAGE COMPANY, LLC, *et al.*,            **ORDER**
          Defendants.

Plaintiff, Dominion Liquid Technologies, LLC (Dominion), brings this diversity action

pursuant to 28 U.S.C. § 1332 against defendants GT Beverage Company, LLC (GT), GT

employee Tom Weiss, and True Drinks, Inc.,[1] raising various state law contract and tort claims.

This matter is currently before the Court on Dominion and GT's summary judgment memoranda

on Dominion's contract repudiation claim (Docs. 113, 114) and their respective rebuttal briefs

(Docs. 115, 116).

**I. Background**

Dominion filed its original complaint against GT and Weiss in July 2011 over a contract

dispute between Dominion and GT; pursuant to the contract, Dominion was to provide bottling

and delivery of GT's patented, spherical bottle. (Doc. 1). Dominion subsequently filed a second

amended and supplemental complaint reflecting True Drinks, Inc.'s status as the successor in

interest to GT. (Doc. 65). In the second amended and supplemental complaint, Dominion

alleges that Tom Weiss sought to enter into an agreement with Dominion, a beverage blending,

bottling, and packaging plant, whereby Dominion would become GT's Midwest bottling

company. (*Id.*, ¶¶ 9, 11, 13, 21). GT holds a patent on a specially designed, spherical bottle,

_____

[1]The parties do not dispute that True Drinks is the successor in interest of GT Beverage Company. For
purposes of clarity, the Court will hereinafter refer to both GT and True Drinks as "GT."

invented by Tom Weiss, used in its sales of the Sportstastic sport beverage product. (*Id.*, ¶¶ 11, 23). Given the unique design of the Sportstastic bottle and in order to serve as GT's Midwest bottling company, Dominion was required to install a new bottling line. (*Id.*, ¶¶ 22, 23). Dominion alleges that despite delays in installing the bottling line, it complied with its contractual duties and that GT breached the contract with Dominion and is liable for the costs of purchasing and installing the bottling line, plus additional financial costs. (*Id.*, ¶¶ 101-04). Dominion's second amended and supplemental complaint also includes claims of promissory estoppel against GT and a negligent misrepresentation claim against Tom Weiss. (*Id.*, ¶¶ 105-14).

Following an unsuccessful attempt at mediation, this matter was reassigned to the undersigned Magistrate Judge upon consent of the parties. (Doc. 107). During a status conference with the Court, the parties explained that the issues raised in their previously filed summary judgment motions (Docs. 85, 86, 87) had been significantly streamlined. The parties agree that Dominion's breach of contract and promissory estoppel claims against GT are moot; thus, the only remaining claims at the summary judgment stage are Dominion's contract repudiation and reliance damages claims. *See* Doc. 111 at 1 n.1, n.2; Doc. 97 at 1-2. The Court ordered the parties to submit a joint statement of undisputed facts and narrowed summary judgment briefs addressing the limited issues. (Docs. 109, 112). The parties timely complied with the Court's order and this matter is now ripe for ruling.

## II. Undisputed Facts

In August 2010, Dominion and GT executed a Packaging Agreement (the Agreement). (Doc. 111, ¶ 1). The Agreement is a valid and binding contract between Dominion and GT. (*Id.*, ¶ 2). *See also*, Doc. 111, Ex. A at PAGEID #3606-13, the Agreement. Pursuant to the

Agreement, Dominion was to construct and install a new bottling line; this required Dominion to incur certain costs for which it now seeks reliance damages. (*Id.*, ¶ 4).

The new bottling line installed by Dominion pursuant to the Agreement is composed of two main sections: the "front end," which is the "wet" end that mixes, bottles, and caps the Sportstastic product, and the "back end," which is the "dry" end that packages and wraps the Sportstastic product. (*Id.*, ¶ 5). Dominion encountered significant unanticipated delays in making the "back end" of the bottling line functional and failed to meet the Agreement's deadlines for having an operational bottling line. (*Id.*, ¶¶ 6-7). Pursuant to the Agreement, Dominion was to meet certain case volume production commitments; Dominion did not meet these commitments prior to GT's letter canceling the Agreement. (*Id.*, ¶ 9). The Agreement does not include a "time is of the essence" provision. (*Id.*, ¶ 8). In 2010 and 2011, GT utilized other co-packagers for business in the Northeast and Midwest. (*Id.*, ¶ 10).

Throughout the course of their relationship, Dominion and GT exchanged numerous phone calls and email communications regarding the Agreement. (*Id.*, ¶ 11). *See also* Doc. 111, Exs. B and C, PAGEID #3614-90, email communications; Doc. 111, Ex. D, PAGEID #3691, log of telephone calls.[2] On April 1, 2011, GT requested that Dominion package an order for 60,000 cases of Sportstastic to be shipped to Wal-Mart on April 28, 2011 (the Wal-Mart Order); the Wal-Mart Order was the first and only order Dominion received from GT. (*Id.*, ¶¶ 13-14). The parties exchanged emails throughout April 2011 discussing whether Dominion would be producing the Wal-Mart Order or if it would be produced by a co-packager. (*Id.*, ¶ 15). *See also*

_____

[2]The parties include five attachments to their undisputed facts; GT refers to these exhibits with numbers one through five, while Dominion refers to them with letters A, B1, B2, C, and D. For purposes of clarity, the Court refers to these exhibits as letters A through E, with corresponding citations to the electronic page filing PAGEID number generated by the CM/ECF electronic filing system.

3

Doc. 111, Exs. B and C, PAGEID #3614-90. Dominion sent an email to GT on April 6, 2011, stating that GT should use other co-packagers to fill the Wal-Mart Order. (*Id.*, ¶ 16).

On April 18, 2011, Dominion received 5,000 GT bottles to test the new bottling line. (*Id.*, ¶ 17). *See also* Doc. 111, Ex. B at PAGEID #3650, Shipping Document. On this same day, GT sent an email to Dominion stating that the Agreement was "cancelled effective this date." (*Id.*, ¶ 18). *See also* Doc. 111, Ex. E at PAGEID #3692, April 18, 2011 cancellation letter. On April 27, 2011, Dominion sent an email to GT stating that its bottling line was ready to begin manufacturing the Sportstastic product. (*Id.*, ¶ 19). *See also* Doc. 111, Ex. B at PAGEID #3649. Dominion did not produce any product relative to the Wal-Mart Order and after April 18, 2011, GT did not send any inventory to Dominion. (*Id.*, ¶¶ 20-21).

### III. Summary Judgment Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Under Federal Rule of Civil Procedure 56(c), a grant of summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Satterfield,* 295 F.3d at 615; *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enterprises, Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249-50. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a prima facie case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

## IV. Resolution

Dominion contends that it is entitled to summary judgment on its contract repudiation claim given GT's April 18, 2011 letter unilaterally cancelling the Agreement. (Doc. 113). Dominion asserts that GT's letter represents a clear and unequivocal repudiation of its intent to perform and as Dominion clearly expressed to GT that it was ready and able to manufacture GT's product, Dominion is entitled to recover damages incurred in relying on the Agreement. Dominion concedes that it did not have a fully operational bottling line within the time frame originally contemplated by the Agreement but contends that timing of performance was not a material term of the Agreement and, further, that GT acquiesced to the delayed performance thus modifying the Agreement.

In opposition, GT maintains that Dominion's motion for summary judgment must fail because § 11c of the Agreement, the Indemnity and Insurance clause, precludes Dominion's claim. GT further argues that even if the claim is not precluded, Dominion materially breached

5

the Agreement prior to GT's issuance of the cancellation letter by failing to meet the

Agreement's timing provisions for completing the bottling line and by refusing to fulfill the Wal-

Mart Order, thereby obviating GT's contractual obligations.  To the extent Dominion argues that

GT acquiesced to the delay or modified or waived the timing provisions of the Agreement, GT

asserts that Dominion's arguments rely on disputed facts and, therefore, its motion for summary

judgment must be denied.

Dominion's summary judgment motion requires resolution of several issues.  As a

threshold matter, the Court must determine whether Dominion's repudiation claim is precluded

by § 11c of the Agreement.  If yes, the inquiry ends and Dominion's claim fails.  If no, the Court

must then determine whether GT's April 18, 2011 cancellation letter amounts to a repudiation of

the Agreement such that Dominion is entitled to reliance damages.  This question turns on

whether the timing of Dominion's performance, *i.e.*, having a fully operational bottling line, was

a material term of the Agreement.  If yes, the Court must then determine whether GT waived

compliance with the timing provision or whether Dominion's delay constituted a breach of the

Agreement thereby eliminating GT's duties under the Agreement.  If no, then the remaining

inquiry is whether Dominion breached the Agreement by refusing to fulfill the Wal-Mart Order

such that GT was no longer required to perform.

A. Whether § 11c of the Agreement Precludes Dominion's Repudiation Claim.

The Agreement provides, in pertinent part, the following limitations on the parties'

liability to each other:

> Notwithstanding the foregoing or any other term condition contained herein in
> this Agreement, neither party shall be liable to the other party for *any indirect,
> punitive, special or consequential damages, including loss of profits, or business
> opportunity or losses* arising out of or in connection with this Agreement.

6

(Agreement, § 11c) (emphasis added).

GT asserts that Dominion's repudiation claim fails as a matter of law given the above cited provision which excludes "losses arising out of or in connection with th[e] Agreement" -- in other words, "all damages claims." (Doc. 116 at 1). GT contends that § 11c is clear and unambiguous, and thus the Court must look no further than the four corners of the Agreement in determining the parties' intent in interpreting the provision. (Doc. 114 at 3) (citing *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011)). Anticipating that Dominion may argue that its requested relief, *i.e.*, reliance damages, are not specifically mentioned in § 11c and are thus not precluded, GT maintains that the provision's language that neither party shall be liable for "losses arising out of or in connection with" the Agreement clearly reflects the parties' intent to limit *all* potential liability arising out of the Agreement. (Doc. 114 at 3). GT maintains that this intent is underscored by the fact that the parties did not include minimum purchase order quantities in the Agreement and the Agreement's recognition that Dominion would not have recourse against GT for shortfall of target expectations. (*Id*. at 3-4).

Alternatively, GT maintains that any ambiguity in the Agreement must be construed against Dominion as the drafter of the Agreement. (Doc. 116 at 2). GT contends that Dominion's president and CEO, Charlie Cain, drafted the Agreement. (Doc. 114 at 4, citing Doc. 55 at 11-12, 23-24, Deposition of Charlie Cain). GT thus maintains that "if [Dominion] argues that the Agreement is ambiguous regarding whether" § 11c precludes reliance damages claims, "that provision must be construed against [Dominion] as the drafter[.]" (Doc. 114 at 4) (citing *Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 798 (6th Cir. 2003)). The remainder of GT's argument pertains to contract interpretation under Ohio law. *See* Doc. 114 at 4-5.

7

In response, Dominion makes several distinct arguments. First, Dominion maintains that the "construed against the drafter" rule does not apply to the instant case because review of Mr. Cain's deposition testimony reveals that he testified to drafting only the first draft of the Agreement but that GT subsequently revised it. (Doc. 115 at 1, citing Doc. 55 at 24). Moreover, Dominion contends that this rule of contract interpretation is ordinarily limited to situations where one contracting party is unsophisticated or in a lesser bargaining position, which is not the case here. (Doc. 115 at 1). Second, Dominion argues that the § 11c provision "contains a series of specific types of indirect damages followed at the end by a generic limitation" that, under the principal of *ejusdem generis*, must be construed as precluding only types of indirect damages. (*Id*. at 2). Dominion maintains that the reliance damages it seeks are not indirect; rather, they are damages flowing directly from GT's repudiation and are typically recoverable in contract actions. (*Id*.). Lastly, Dominion maintains that the Court must construe the Agreement in a fair and reasonable manner as opposed to adopting an interpretation that would render a harsh and unreasonable outcome. (*Id*. at 3) (citing 11 Williston on Contracts § 32:11 (4th ed. 2013)) (internal citation omitted). Dominion contends that if the Court adopts GT's construction, the result would be unduly prejudicial to Dominion given its investment of approximately $750,000 in reliance on GT's promise to provide it with purchase orders and inconsistent with the approach of Ohio courts. (*Id*. at 3-4).

The Court notes at the outset that because this matter is based on the diversity jurisdiction of the Court under 28 U.S.C. § 1332, the substantive law of the State of Ohio applies to Dominion's contract repudiation claim. *See Klaxon Co. v. Stentor Elec. Mfg., Co.*, 313 U.S. 487, 496 (1941). "Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination

8

by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (citing cases).

Where a contract is clear and unambiguous, "a court may not resort to construction of that

language." *Waste Mgmt., Inc. v. Rice Danis Inds. Corp.*, 257 F. Supp.2d 1076, 1083 (S.D. Ohio

2003) (citing cases). Contractual language is ambiguous where its meaning cannot be

determined from the four corners of the contract or where it can reasonably be interpreted in

more than one manner. *Savedoff*, 524 F.3d at 763. Ambiguous language is generally construed

against the drafter, especially where the parties are of unequal bargaining power. *Id.* at 764.

However, this construction rule "does not allow a court to adopt an unreasonable interpretation

of the contract." *Id.* (citing *Morfoot v. Stake*, 190 N.E.2d 573, 574 (Ohio 1963)). *See also Rice

Danis*, 257 F. Supp.2d at 1083 ("Of course, a contract must not be interpreted in a manner which

leads to an absurd result.").

The parties do not assert that § 11c of the Agreement is ambiguous on its face; rather,

they present contrasting interpretations of the provision based on its plain language.[3]  As stated

above, GT asserts that § 11c acts as a general bar to Dominion's repudiation claim while

Dominion maintains that the liability provision precludes only claims for indirect damages but

not for damages arising directly from a breach of the Agreement.  Given the parties' disparate

understandings of § 11c, the Court must interpret this provision consistent with the intent of the

parties and Ohio law. *Savedoff*, 527 F.3d at 763.  In determining the meaning of disputed terms,

courts generally look to extrinsic evidence such as the circumstances under which the Agreement

was made and the parties' objective in entering into the Agreement. *Covington v. Lucia*, 784

---

[3]The Court recognizes that GT proffers significant argument in its briefings as to how the Court is to construe ambiguous contract language based on its assumption that Dominion might argue that §11c should be disregarded for ambiguity. *See* Doc. 114 at 3. However, Dominion does not assert in either of its briefs that this provision, or any other provision in the Agreement, is ambiguous. *See* Docs. 113, 115.

9

N.E.2d 186, 190 (Ohio Ct. App. 2003). Such an inquiry is unnecessary here as the parties

maintain, and the Court agrees, that the Court may glean the provision's meaning by employing

basic contractual interpretation guidelines.

Both parties assert that the Court's interpretation of § 11c should be guided by the

principle of *ejusdem generis*. *See* Doc. Doc. 115 at 2; Doc. 116 at 2.[4] *Ejusdem generis* is "[a]

canon of construction that when a general word or phrase follows a list of specific persons or

things, the general word or phrase will be interpreted to include only persons or things of the

same type as those listed." *Black's Law Dictionary* 556 (8th ed. 2004). *See also In re*

*Thornton*, 331 B.R. 306, 310-11 (Bankr. N.D. Ohio 2005) ("with matters of interpretation,

whether statutory or contractual, it is the rule that the more specific provision will govern the

more general provision.") (citing cases); *Smilack v. Bowers*, 147 N.E.2d 499, 501 (Ohio 1958)

("The rule of *ejusdem generis* based on the maxim, *expressio unius est exclusio alterius*, means

that, where general words are used in a statute preceded or followed by words of a particular and

---

[4]While GT concedes that the canon may be employed, it argues that "[t]he doctrine of *ejusdem generis* only applies to ambiguous language, and when it does, it creates a question of fact." (Doc. 116 at 2). GT thus maintains that by arguing ambiguity, Dominion's summary judgment motion must be denied because its claims rest on disputed facts. In support, GT cites to *Brown v. Columbus All-Breed Training Club*, 789 N.E.2d 648 (Ohio Ct. App. 2003), where the Ohio Court of Appeals applied the doctrine to interpret contractual language similar to that in § 11c. The *Brown* court held that summary judgment was not appropriate as applying the doctrine of *ejusdem generis* made clear that there was a question of fact as to the intent of the provision at issue. *Id*. at 653. *Brown* does not, however, stand for the proposition that summary judgment is inappropriate in every case where *ejusdem generis* is utilized. The doctrine of *ejusdem generis* is frequently employed by courts at the summary judgment stage to determine the meaning of contractual language as a matter of law. *See, e.g.*, *Retail Ventures, Inc. v. Nat. Union Fire Ins. Co. of Pittsburg, Pa.*, 691 F.3d 821 (6th Cir. 2012) (affirming grant of summary judgment where District Court applied principle of *ejusdem generis* to interpret contract language); *Hydro-Dyne, Inc. v. Ecodyne Corp.*, 812 F.2d 1407 (6th Cir. 1987) (same); *Bates v. Crown Life Ins. Co.*, No. C-2-83-2154, 1987 WL 862369 (S.D. Ohio Mar. 31, 1987) (applying *ejusdem generis* at summary judgment stage and interpreting the language at issue as a matter of law). *Brown* is also distinguishable from the instant case as, unlike the Agreement presented here, the release in *Brown* was "poorly drafted and more poorly edited" and fell "short of a clear and understandable document." *Brown*, 789 N.E.2d at 653. *Brown* is further distinguishable as it was a negligence action involving a "patently unclear" boiler-plate release form. *Id*. In contrast, the Agreement here is a cogent and thoughtful contract drafted to memorialize the parties' commercial relationship. Accordingly, the undersigned finds that *Brown* does not mandate denial of Dominion's summary judgment claim due to the Court's application of *ejusdem generis* to interpret § 11c of the Agreement.

specific meaning, such general words are to be limited to embrace those items of the same

general kind or class as the one specifically mentioned."). *Ejusdem generis* embraces the general

notion that if parties intended that the general terms were to apply unrestricted, they would not

have included the specific terms or classes in the first instance. *New Castle Cty. v. Natl. Union*

*FireIns. Co. of Pittsburgh*, 243 F.3d 744, 751 (3d Cir. 2001) (quoting *Donaghy v. State*, 100 A.

696, 707 (Del. 1917)).

　　While GT asserts "the Agreement unambiguously states that 'neither party shall be liable

to the other party for any . . . losses arising out of or in connection with this Agreement'" (Doc.

114 at 4), GT's construction would render the balance of the clause meaningless. Ohio contract

law does not permit such an outcome. *See Foster Wheeler Enviresponse, Inc. v. Franklin Cty.*

*Convention Facilities Auth.*, 678 N.E. 519, 526 (Ohio 1997) (quoting *Farmers Nat'l Bank v.*

*Delaware Ins. Co.*, 94 N.E. 834, ¶ 6 (Ohio 1911) ("[I]f one construction of a doubtful condition

written in a contract would make that condition meaningless, and it is possible to give it another

construction that would give it meaning and purpose, then the latter construction must obtain.").

If a party were not permitted recovery for "any" losses arising from the Agreement, there would

be no purpose for the additional qualifying language that GT omits: "indirect, punitive, special

or consequential damages, including loss of profits, or business opportunity." Applying *ejusdem*

*generis* and the construction principle enunciated in *Foster Wheeler Enviresponse* to § 11c, the

Court concludes that the term "or losses arising out of or in connection with this Agreement"

necessarily refers to the prior phrase "neither party shall be liable to the other party for any

direct, punitive, special or consequential damages, including loss of profits, or business

opportunity. . . ." (Agreement, § 11c). The parties first listed the specific types of consequential

damages they intended to preclude recovery for – "indirect, punitive, special or consequential

damages, including loss of profits, or business opportunity" – and then referred to "losses arising

out of or in connection" with the Agreement. Such construction is precisely when *ejusdem*

*generis* applies. The general term "losses arising out of or in connection" refers back to the more

explicit classes of damages, and is intended to exclude only similar types of damages. *See Bates*

*v. Crown Life Ins. Co.*, No C-2-83-2154, 1987 WL 862369, at *6 (S.D. Ohio Mar. 31, 1987).

Accordingly, the Agreement precludes recovery only as to those damages specifically identified

– indirect damages, punitive damages, special damages, consequential damages, loss of profits,

and lost business opportunity – or similar thereto.[5] *See Foreclosure of Liens for Delinquent*

*Taxes v. Parcel of Land Encumbered With Delinquent Tax Liens*, No. 98CA75, 1999 WL

335131, at *6-7 (Ohio Ct. App. May 28, 1999) (applying *ejusdem generis* in holding that terms

that were "qualitatively dissimilar" from those specifically listed were not governed by the

expiration provision at issue). In addition, GT's contrary interpretation would essentially

preclude any and all claims arising out of a party's breach of the Agreement and render the

specific language the parties employed in the Agreement meaningless. *See* Agreement, § 12 (the

Agreement includes a "Default and Termination" provision whereby a party can be held liable to

the other if, *inter alia*, it "fails to comply with any of its obligations [under the Agreement]. . .

."). *See also Sunoco, Inc.,* 953 N.E.2d at 292 (courts must examine the contract as a whole).

In consideration of the Agreement as a whole and applying the doctrine of *ejusdem*

*generis* to § 11c, the Court finds that the Agreement does not bar all potential claims for liability

as GT contends but only for damages claims akin to those specifically identified in § 11c of the

---

[5]Though it is not binding authority, the matter of *Tennessee Gas Pipeline Co. v. Technip USA Corp.*, No. 01-06-535-cv, 2008 WL 3876141 (Tx. Ct. App. Aug. 21, 2008) is particularly instructive and supports this conclusion. In *Technip*, the Texas Appellate Court applied the doctrine of *ejusdem generis* and held that contract language substantial similar to that in § 11c of the Agreement, when considered in conjunction with contract

Agreement. The Court must therefore determine whether the damages sought by Dominion fall within the class of damages explicitly excluded.

Generally, Ohio law provides for three categories of damages for breach of contract: expectancy damages, reliance damages, and restitution damages. *Brads v. First Baptist Church of Germantown, Ohio*, 624 N.E.2d 737, 744-45 (Ohio Ct. App. 1993) (citing Restatement of the Law 2d, Contracts (1981), § 344)); *Brown Deer Restaurant, Inc. v. New Market Corp.*, No. 48910, 1985 WL 9802, at *4 (Ohio Ct. App. Mar. 28, 1985) (citing Restatement of the Law 2d, Contracts (1981), §§ 347, 349, 372)). Expectancy damages are based on the aggrieved party's expectation interests and are intended to "give him the benefit of his bargain by putting him in the position he would have achieved if the contract had been performed"; reliance damages are intended to put the aggrieved party "in the position he would have remained if there had been no contract"; and restitution damages are intended to allow recovery of any benefit conferred on the breaching party by part performance or reliance. *Brown*, 1985 WL 9802, at *4. "The aggrieved party can recover damages by only one of these measures since they accomplish inconsistent purposes." *Id.* (citing Restatement of the Law 2d, Contracts (1981), §§ 347, 349, 372); 12 Williston, Contracts § 1455 (Jaeger ed. 1970); *Yurchak v. Jack Boiman Constr. Co.*, 443 N.E.2d 526 (Ohio Ct. App. 1981)).

In connection with its repudiation claim, Dominion seeks reliance damages "for all amounts which [Dominion] expended for the purchase and installation of the additional bottling line, plus associated financing costs." (Doc. 65, ¶ 104). Reliance damages for such out-of-pocket expenses are intended to reimburse a party for funds expended during its execution of a

---

language limiting one of the parties' liability, did not preclude recovery of direct damages. *Id.* at *6-7.

13

contract in order to restore them to the status quo prior to the contract. *See Crawn v. Croxton*, No. CA-6987, CA-6989, 1987 WL 9966, at *3 (Ohio Ct. App. Apr. 6, 1987). *See also* Restatement (Second) of Contracts § 349 (1981) (reliance damages are those "expenditures made in preparation for performance or in performance"). The relevant inquiry is whether the reliance damages sought by Dominion are the type of damages for which recovery is precluded by the Agreement, *i.e.*, indirect, punitive, special, and consequential damages.

It is clear and the parties do not dispute that the reliance damages Dominion seeks are dissimilar from claims for punitive and special damages. "[U]nder Ohio law punitive damages are generally not recoverable in an action for breach of contract." *Mabry-Wright v. Zlotnik*, 844 N.E.2d 858, 862 (Ohio Ct. App. 2005). Only "where the breach of contract is accompanied by a connected, but independent tort involving fraud, malice or oppression" are punitive damages permitted. *Goldfarb v. The Robb Report, Inc.*, 655 N.E.2d 211, 215 (Ohio Ct. App. 1995) (citing *Saberton v. Greenwald*, 66 N.E.2d 224, 229-30 (Ohio 1946)). Dominion does not allege that GT committed a tort in connection with the Agreement but only that it repudiated the Agreement; as such, Dominion contends it is entitled to damages to put it back in its original position prior to the Agreement. Accordingly, the Court finds that the reliance damages Dominion seeks are not akin to punitive damages.

Likewise, neither party contends that the reliance damages sought are in the same class of damages as special damages. "'Special damages' are damages of such a nature that they do not follow as a necessary consequence of the injury complained of, and are damages that, though actually resulting from an injury, are not implied by law." 30 Ohio Jur. 3d Damages § 11. This is in contrast to "general damages" which "are damages that naturally and necessarily result from a wrongful act or omission and that are directly traceable to, and are the probable and necessary

14

result of, the injury caused by that act." *Id*. Special damages must be specifically pleaded, whereas allegations of general damages need not be. *Homes by Calkins, Inc. v. Fisher*, 634 N.E.2d 1039, 1042 (Ohio Ct. App. 1993). Examples of special damages include recovery for a delay in receiving shipped goods where the delay caused the goods to be of lower value, and recovery for time and expense associated with the sale of poultry where the birds were ill and required medical treatment. *See Concrete Steel Co. v. Erie R. Co.*, 28 Ohio N.P. 464, 465 (Ohio Ct. Common Pleas, Summit Cty. Apr. 8, 1931); *Grovedale Feed Co. v. Corron*, 155 N.E.2d 291, 295 (Ohio Mun. 1957). Unlike these special damages, the damages Dominion seeks – recovery of the money expended in installing the bottling line for GT's specialized Sportstastic product – flow naturally from the parties' obligations under the Agreement. Thus, the reliance damages are not similar to special damages.

Ohio courts treat consequential damages as being synonymous with special damages. *See Sherman R. Smoot Co. v. Ohio Dept. of Adm. Serv.*, 736 N.E.2d 69, 81 (Ohio Ct. App. 2000). The Court therefore finds that the reliance damages sought by Dominion are not akin to consequential damages for the reasons stated above in connection with the discussion on special damages. Similarly, Ohio courts describe indirect damages as analogous to consequential damages or losses, which may include such damages as lost production time or lost profits. *See Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*, 653 N.E.2d 661, 667 (Ohio 1995). *See also Bronze Bushing Co., Inc. v. North American Mfg. Co.*, No. 68852, 1996 WL 157337, at *4 (Ohio Ct. App. Apr. 4, 1996). Thus, the reliance damages sought by Dominion are likewise distinct from the class of indirect damages.[6] Because the damages Dominion seeks are not of the

_____

[6]Neither party maintains that Dominion's damages are reasonably classified as lost profits or lost business opportunity damages. As a plain reading of Dominion's second and supplemental complaint demonstrates that the

15

type specifically precluded by § 11c, the Court finds that Dominion's contract repudiation claim is not barred by the terms of the Agreement.

As a final matter, GT's contention that § 11c must be construed against Dominion as the drafter of the Agreement is not well-taken. Citing to the deposition testimony of Mr. Cain, GT argues that Mr. Cain drafted the Agreement and, consequently, any ambiguity must be construed against Dominion. (Doc. 114 at 4). Yet, review of this testimony contradicts GT's assertion. While Mr. Cain testified that he created the first draft of the Agreement, he further testified that GT subsequently revised it. *See* Doc. 55 at 23-24. GT has not presented any evidence disputing Mr. Cain's testimony that Dominion and GT representatives collaborated in drafting the Agreement and its argument is unpersuasive given its failure to address this highly pertinent testimony.[7] As the undisputed evidence demonstrates that GT and Dominion both had a hand in drafting the Agreement, the Court declines to construe the § 11c language against Dominion. *See Klug v. Klug*, No. 19369, 2003 WL 21360893, at *3 (Ohio Ct. App. June 13, 2003) ("When the parties to a contract are knowledgeable and represented by experienced drafters a court should not construe an ambiguous provision against the party who drafted the final provision.") (citing *Wall v. Firelands Radiology, Inc.*, 666 N.E.2d 235 (Ohio Ct. App. 1995)).

For the above reasons, the Court finds that Dominion's anticipatory repudiation claim for reliance damages is not precluded by § 11c of the Agreement. The Court now turns to the merits of Dominion's claim.

_____

reliance damages sought are related solely to costs incurred by Dominion, the Court need not engage in a full inquiry of these types of damages to determine that Dominion's reliance damages are not in the same category as claims based on loss of profits or lost business opportunity.

[7] Notably, in its reply brief, Dominion provides a copy of an August 17, 2010 email sent by a GT employee which supports Mr. Cain's testimony that GT revised the contract following his initial draft. The email provides: "Gentlemen, Here is our revised version of the contract" and was sent by E.G. (Geno) Abbadessa of GT Beverage Company, LLC. *See* Doc. 115, Ex. 1.

B. Whether GT is Liable to Dominion for Anticipatory Repudiation of the Agreement.

To prevail on its anticipatory repudiation claim, Dominion "must establish that there was a contract containing some duty of performance not yet due and, by word or deed, [GT] refused future performance, causing damage to [Dominion]." *Myers v. Evergreen Land Dev. Ltd.*, No. 07 MA 123, 2008 WL 650774, at *4 (Ohio Ct. App. Mar. 6, 2008) (citing *McDonald v. Bedford Datsun*, 570 N.E.2d 299, 301 (Ohio Ct. App. 1989)). "The repudiation must be expressed in clear and unequivocal terms. . . ." *McDonald*, 570 N.E.2d at 301. "[A]nticipatory repudiation centers on an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." *Nuco Plastics, Inc. v. Universal Plastics, Inc.*, 601 N.E.2d 152, 154 (Ohio Ct. App. 1991).

It is undisputed that GT sent the following communication to Dominion on April 18, 2011:

> This letter is to inform you that the Packaging Agreement entered into on the 1st day of August, 2010 between Dominion Technologies, LLC and GT Beverage Company, LLC is cancelled effective this date.
>
> Please prepare all materials currently consigned to Dominion for pick up by our carrier no later than Friday, April 22, 2011.

(Doc. 111, Ex. E at PAGEID #3692). GT does not dispute that this letter was an overt and unequivocal communication intended to cancel the Agreement between the parties. GT contends, rather, that the cancellation letter does not constitute a repudiation of the Agreement as Dominion had already breached the Agreement. GT's argument relies on the Ohio contract law principle that "a non-breaching party to a contract is excused from complying with conditions of the contract, when the party for whose benefit the condition operates has already materially breached the contract." *Rice Danis*, 257 F. Supp.2d at 1084. Put simply, GT asserts that because

17

Dominion breached the Agreement prior to April 18, 2011, by not having the bottling line

installed within the timeline contemplated by the Agreement and by refusing to produce the Wal-

Mart Order, GT was excused from complying with the conditions of the Agreement. *See* Doc.

114 at 5-6; Doc. 116 at 2.

To determine whether GT's cancellation constitutes repudiation of the Agreement, the

Court must determine if Dominion first breached the contract as GT contends. This inquiry turns

on whether the timing of Dominion's performance, *i.e.*, have an operational bottling line, was a

material contractual term.

### 1. *Whether Timing was Material to the Agreement*

The Agreement provides as follows regarding Dominion's performance deadlines:

> The New [bottling] Line will be designed to produce 20,000 12 pack cases per
> day of [GT] products.  Upon initial startup *to occur during the 4Q 2010*, it will be
> capable of producing 10,000 12 pack cases per day, or 40,000 12 pack cases per
> week.  During fourth quarter of 2010, [Dominion] will make modifications to the
> New [bottling] Line to allow for production capability of 20,000 12 pack cases
> per day *commencing sometime during 1Q or 2011.*

(Agreement, § 2) (emphasis added).  It is undisputed that Dominion did not have the bottling line

partially operational by the fourth quarter of 2010 or fully operational during the first quarter of

2011.  (Doc. 111, ¶ 7).  It is also undisputed that the Agreement does not include a "time is of the

essence" provision.  (*Id.*, ¶ 8).

Dominion argues that the omission of a "time is of the essence" provision in the

Agreement demonstrates that the timing of its performance was not a material term and,

consequently, its failure to meet the timelines set forth in the Agreement does not excuse GT

from performing.  Dominion contends that the immateriality of its timing of performance is

further established by the fact that GT sent no orders to Dominion in either the fourth quarter of

18

2010 or the first quarter of 2011. Moreover, Dominion argues that the timing provisions in the Agreement were modified when GT acquiesced to Dominion's delayed performance by using other packers to fill its bottling orders during the relevant time period. Dominion supports its arguments with various email communications between the parties.[8] (Doc. 113 at 5-9).

In opposition, GT asserts that despite the lack of a "time is of the essence" clause, the timing of performance was a material term of the Agreement and Dominion's failure to perform within the contemplated time constitutes a breach. GT maintains that this materiality is demonstrated by the deposition testimony of its employees, Bob and Tom Weiss. (Doc. 116 at 4, citing Doc. 51 at 157-58; Doc. 53 at 60-63). GT further contends that regardless of whether timing was material, Dominion's delay constitutes a breach because it failed to perform in a reasonable time. (Doc. 114 at 8).

For the following reasons, the Court finds that the timing of Dominion's performance was not a material term of the Agreement and that Dominion's delays were not unreasonable so as to constitute a breach.

"Ohio courts indicate that, absent an express indication by the contracting parties to the contrary, the time of performance is not of the essence." *Lang v. D&J Homes*, 494 F. Supp.2d 799, 805 (S.D. Ohio 2007) (citing *Brown v. Brown*, 630 N.E.2d 763, 765 (Ohio Ct. App. 1993)). Parties can stipulate otherwise by including a "time is of the essence" clause in a contract or the requirement for timely performance can be implied from the contract itself. *Brown*, 630 N.E.2d at 765. While some courts have found time to be of the essence when a contract includes a specific deadline for performance, *id.* (citing *Domigan v. Domigan*, 189 N.E. 860 (Ohio 1933)),

---

[8]These communications may be considered by the Court in determining the instant summary judgment motion as they were incorporated by the parties into their statement of undisputed facts. *See* Doc. 111, ¶ 4.

where contracts are multifaceted, Ohio courts follow the approach that "performance within a reasonable time of the specified date is sufficient to comply with the requirements of the contract." *Brown*, 630 N.E.2d at 766 (citing cases). Put simply, where a contract's timing provision is just one of many, "it is presumed that the parties did not intend for time to be of the essence in the absence of any express stipulation in the agreement." *Brown*, 630 N.E.2d at 766. *See also Indep. Lift Truck, Inc. v. Peitti Enters., Inc.*, No. 54875, 1988 WL 140567, at *4 (Ohio Ct. App. Dec. 19, 1988) (delayed performance of one party does not relieve the other party of its obligations unless "(1) the nature of the contract makes [performance] by that date vitally important, or (2) the contract expressly provides that time is of the essence"); *Gardner v. Hidden Harbour Partners*, No. L–97–1182, 1997 WL 799710, at *3 (Ohio Ct. App. Dec. 31, 1997) ("It has long been held that generally time is not of the essence unless it has been made so by the express terms of the contract, or if the parties have treated it as such, or the nature of the contract requires it.").

In the absence of a "time is of the essence" provision, Dominion's failure to meet the deadlines in § 2 of the Agreement is not, in itself, a material breach. The purpose of the Agreement was to create a legally binding commitment between the parties under which Dominion would produce GT's products for a renewable term of three years. (Agreement, Preamble and § 3). Thus, the crux of the Agreement was not limited to Dominion's ability to perform by a date certain or to fill the Wal-Mart Order; the Agreement envisioned a much broader and longer arrangement. As such, Dominion's failure to meet the specified deadlines or produce the Wal-Mart Order did not defeat the purpose of the Agreement; consequently, its delay does not constitute a material breach. *See Brown*, 630 N.E.2d at 766.

Insofar as GT contends that the timing of performance was a material term of the

20

Agreement based on the testimony of Tom and Bob Weiss, this argument is unavailing. Notably, Bob Weiss testified that he "wasn't involved in the contract." (Doc. 53 at 61). It is thus unclear how his testimony is pertinent to the issue of the terms of the Agreement. Further, to the extent Bob Weiss believed that Dominion was in default due to its late performance (*id.* at 62-63) his lay opinion as to Dominion's contractual obligations is irrelevant to the Court's determination as to whether timing of performance was a material term under the Agreement. *See Gardner*, 1997 WL 799710, at *3. Likewise, Tom Weiss' testimony that "the contract was no good when [Dominion] didn't supply from the beginning from first quarter" and that the "contract was null and void" is simply his opinion and has no bearing on the legal determinations at issue.[9]

GT also relies on *Dugan & Meyers Constr. Co., Inc. v. Ohio Dept. of Adm. Servs.*, 834 N.E.2d 1, in support of its assertion that the unanticipated delays in installing the bottling line do not justify or excuse Dominion's failure to perform within the Agreement's timelines. (Doc. 114 at 6). GT's reliance on this case in attempting to demonstrate Dominion's breach is misplaced. The contract in *Dugan* included a "time is of the essence" provision as well as a provision providing for liquidated damages in the amount of $3000.00 per day for delayed performance. *See Dugan*, 834 N.E.2d at 3. Further, the late-performing party in *Dugan* was repeatedly notified that timing was critical and was given formal notice of the need to timely perform. *Id.* at 5. In contrast, here there is no "time is of the essence" provision in the Agreement and there is no

---

[9]The Court also notes that emails sent by Tom and Bob Weiss throughout this period belie their testimony that the timing of Dominion's performance was material. *See* Doc. 111, Ex. B at PAGEID # 3637 (on March 14, 2011, Tom Weiss emailed Charlie Cain and informed him that GT would not be able to get bottles to Dominion at that time and that he was working on obtaining financing); Doc. 111, Ex. B at PAGEID # 3648 (on April 8, 2011, Bob Weiss emailed Charlie Cain after being advised that Dominion would not be able to fill the Wal-Mart Order and requested that Dominion ship bottle caps to a Montana facility to allow the other facility to begin filling the order). There is nothing in these or any other communications from GT to Dominion from which it can reasonably be discerned that Dominion's failure to meet the Agreement's timeline was material.

21

evidence demonstrating that GT ever notified Dominion that the time of performance was critical. Rather, GT employee Bob Weiss communicated to Dominion as late as April 6, 2011, that he understood that Dominion would not be able to fulfill the Wal-Mart Order, that he appreciated being apprised of the situation, and that GT would send purchase orders to Dominion when the bottling line was operational. *See* Doc. 111, Ex. B at PAGEID # 3645 (April 6, 2011 email string). *Dugan* is inapposite given the stark contrast between its facts and those present here. In sum, absent a "time is of the essence" provision, Dominion did not breach the Agreement unless it failed to perform within a reasonable time. *See Carrocce v. Shaffer*, No. 96-T-5521, 1997 WL 703371, at *2 (Ohio Ct. App. Oct. 31, 1997) (citing *Harris v. Ohio Oil Co.*, 48 N.E. 502 (Ohio 1897)).

GT argues in the alternative that even if Dominion did not breach the Agreement by failing to perform on the specified dates, it nevertheless breached by failing to perform within a reasonable time. (Doc. 114 at 8-9). When time of performance is not of the essence, "the law implies that performance must take place within a reasonable time [and failure] to perform within a reasonable time constitutes a material breach of the contract." *Morton Bldgs., Inc. v. Correct Custom Drywall, Inc.*, No. 06AP-851, 2007 WL 1641155, at *3 (Ohio Ct. App. June 7, 2007) (internal citations omitted). "Reasonable time for a contract's performance is not measured by hours, days, weeks, months or years, but is to be determined from the surrounding conditions and circumstances which the parties contemplated at the time the contract was executed." *Miller v. Bealer*, 608 N.E.2d 1133, 1135 (Ohio Ct. App. 1992). In determining whether performance was tendered within a reasonable time, the Court should consider "any uncontrollable delays encountered during performance" and then "must gauge whether the length of time spent performing was reasonable." *Morton Bldgs.*, 2007 WL 1641155, at *3.

22

Here, the record demonstrates that the parties contemplated that Dominion would have a partially operational bottling line by the fourth quarter of 2010 and that the line would be fully operational by first quarter 2011. (Agreement, § 2). These deadlines passed due to various and significant delays experienced by Dominion relating to the "back end" of the line. (Doc. 111, ¶ 6). As evidenced by the emails submitted by the parties, the delays experienced by Dominion were "uncontrollable" and were not the fault of either party. *See* Doc. 111, Ex. B at PAGEID # 3629-31 (February 15, 2011 email string showing that the bottling line machinery company encountered difficulties in providing properly sized materials from its manufacturer in China); *id.* at PAGEID # 3645-46 (April 6, 2011 email string wherein Charlie Cain advised Bob and Tom Weiss that he could not guarantee Dominion's ability to fulfill the Wal-Mart Order as the line was set to be commissioned in the next week); Doc. 111, Ex. B at PAGEID # 3660-63, 3673-78 (March 9, 2011 email string between Dominion employees and the machine parts provider showing the provider made significant errors that contributed to the delay).

Moreover, leading up to the April 18, 2011 cancellation letter, there is nothing in the communications between the parties that demonstrates that GT believed Dominion's delays were unreasonable. Rather, when Charlie Cain advised Bob Weiss on April 6, 2011, that GT should divvy up the Wal-Mart Order among GT's other manufacturers because he could not guarantee Dominion's ability to perform in time to meet the deadline, Bob Weiss responded simply: "Understood; I appreciate your honesty. Please let me know when you think you will be ready and I will get you P.O.'s [purchase orders]." (Doc. 111, Ex. B at PAGEID # 3645, April 6, 2011 email string). Nothing about this communication from GT intimates that it found Dominion's delay unreasonable. To the contrary, Bob Weiss affirmatively acknowledged his appreciation for Dominion's position and reaffirmed GT's obligations under the Agreement by stating that it

23

would provide Dominion with purchase orders as soon as Dominion was ready.

In consideration of the central purpose of the Agreement and that: (1) the delays experienced by Dominion in performing were not its fault and were out of its control, and (2) GT's conduct throughout the relevant time period, especially its April 6, 2011 promise to provide purchase orders in the future despite Dominion's delayed performance, the undersigned concludes that Dominion did not fail to perform within a reasonable time. Dominion notified GT on April 27, 2011, 21 days after GT promised to provide purchase orders when Dominion was ready, that the bottling line was operational. Dominion's performance within three weeks of GT's renewed promise to continue with the Agreement was reasonable in light of the attendant circumstances. If GT had intended for time to be of the essence, "it should have been made an essential part of the contract terms." *United States Constr. Corp. v. Harbor Bay Estates, Ltd.*, 876 N.E.2d 637, 643 (Ohio Ct. App. 2007). Thus, Dominion performed within a reasonable time by having an operational bottling line as of April 28, 2011.[10]

> 2. *Assuming, Arguendo, that Timing Was a Material Term, GT Waived Dominion's Compliance and Modified the Term.*

Even if the Court were to find that the timing of Dominion's performance was material to

---

[10]The Court recognizes that it is impossible for Dominion to establish that the line was fully operational on April 27, 2011, given that GT cancelled the contract nine days prior and did not provide Dominion with the bottling materials necessary to prove the line's functionality. While GT asserts that Dominion cannot produce undisputed evidence that it was capable of performing as of April 27, 2011, and that summary judgment is therefore inappropriate (Doc. 114 at 9-10), the undersigned disagrees. GT cannot insist that Dominion establish this ability to perform as it cancelled the Agreement, thereby making it impossible for Dominion to show that it was able to fully perform. *See Daniel E. Terreri & Sons, Inc. v. Mahoning Cty. Bd. of Comm'rs*, 786 N.E.2d 921, 933 (Ohio Ct. App. 2003). Moreover, Dominion employees Charlie Cain and Brian Young testified that Dominion was ready to produce the Sportstasic Product at the end of April 2011. (Doc. 55 at 106-07, 340-41; Doc. 57 at 130). GT presents no evidence disputing this testimony. Such undisputed deposition testimony suffices to show a party's readiness and ability to perform. *See Allegro Realty Advisors, Ltd. v. Orion Assoc., Ltd.*, No. 87004, 2006 WL 2567665, at *6 (Ohio Ct. App. Sept. 7, 2006); *David Moore Builders, Inc. v. Hudson Village Joint Venture*, No. 22118, 2004 WL 2244471, at *4 (Ohio Ct. App. Sept. 22, 2004). Here, where Dominion cannot make any further affirmative showing of ability to perform due to GT's cancellation of the Agreement, this undisputed deposition testimony is sufficient to establish that Dominion was ready and able to perform as of April 27, 2011.

the Agreement, the undisputed evidence demonstrates that GT waived this provision and

modified the Agreement. "Under Ohio law, a party may waive contractual terms by intentionally

acting in a manner inconsistent with the claimed right and thereby be estopped from insisting

upon it." *MoonScoop SAS v. Am. Greetings Corp.*, 489 F. App'x 95, 106 (6th Cir. 2012) (citing

cases). *See also Thomas v. Nat'l Coll. of Virginia, Inc.*, 901 F. Supp. 2d 1022, 1032 (S.D. Ohio

2012) (quoting *Hacker v. Nat'l College of Bus. & Technology*, 927 N.E.2d 38, 42 (Ohio Ct. App.

2010)) ("a party may relinquish a right by either express words or by conduct which seems to

dispense with performance at the designated time."). "An implied waiver will arise when the

claimant has been prejudicially misled or lulled into believing strict compliance is not required."

*Sandler v. All Acquisition Corp., Inc.*, 954 F.2d 382, 385 (6th Cir. 1992) (citing *McMillen v.

Willys Sales Corp.*, 193 N.E.2d 160, 164 (Ohio Ct. App. 1962)). "A 'time is of the essence'

clause may be waived when the party to be benefited does any act inconsistent with the

supposition that he continues to hold the other party to his part of the agreement." *Id*. (quoting

*Hayes Mfg. Corp. v. McCauley*, 140 F.2d 187, 190 (6th Cir. 1944)). "[W]hen such waiver is

made, one cannot arbitrarily declare a forfeiture of the contract for delay, but must first demand

payment or performance and give the other party a reasonable time to comply." *Ohio Tool Co. v.

Lang*, No. 7652, 1926 WL 2890 (Ohio Ct. App. Nov. 22, 1926).

The record before the Court demonstrates that GT acted inconsistently with its right to

require Dominion's strict compliance with the timing provision of the Agreement. While the

Agreement provided that Dominion was to have a partially operational bottling line in the fourth

quarter of 2010, there is no evidence that GT attempted to have Dominion fill any bottling orders

during this time or demanded that Dominion fill any bottling orders. Rather, GT used other

bottlers to fill orders in both 2010 and 2011 for its Midwest and Northeast business despite the

Agreement's geographical provision requiring GT to use Dominion for such orders. *See* Doc.

111, ¶ 10; Agreement, § 2. Communications from GT demonstrate that as of January 21, 2011,

it had not yet sent any orders to Dominion and did not foresee doing so until the end of February

2011. (Doc. 111, Ex. B at PAGEID # 3622, January 21, 2011 email string). This

communication also shows that as of January 2011, GT was aware of the potential for delay as

Dominion had not yet received parts from China necessary to complete the bottling line. (*Id.*).

On February 15, 2011, Dominion again notified GT that it was experiencing significant problems

in installing the line and that further delays were probable. *Id.* at PAGEID # 3629 (February 15,

2011 email string). Despite Dominion's failure to meet the initial 2010 deadline and GT's

awareness of anticipated ongoing delays, GT continued to work with Dominion regarding future

purchase orders *Id.* at PAGEID # 3633-34 (February 25, 2011 email string regarding GT's

proposal on cash flow between the companies); *Id.* at PAGEID # 3635-36 (March 7, 2011 email

string regarding GT's promise to get components to Dominion); *Id.* at PAGEID # 3637 (March

14, 2011 email from GT promising to get components to Dominion upon securing financing).

GT's conduct, *i.e.*, its ongoing communications and negotiations with Dominion on work to be

performed in the future, is inconsistent with an expectation that Dominion was to strictly comply

with the Agreement's deadlines; thus, GT waived its rights under this provision. *See*

*MoonScoop*, 489 F. App'x at 106. *See also Turner v. Speyer*, 3:08-cv-1304, 2010 WL 2076808,

at *2 (N.D. Ohio May 24, 2010) (citing *Ohio Farmers' Ins. Co. v. Cochran*, 135 N.E. 537, ¶ 3

(Ohio 1922) (plaintiffs waived right to claim breach of a deadline by continuing to work with

defendants towards achieving purpose of the contract); *Ohio Turnpike Comm'n v. Pers. Data*

*Sys., Inc.*, No. 48412, 1985 WL 7463, at *3-4 (Ohio Ct. App. Jan. 24, 1985) (when contract's

deadline passed and plaintiff failed to notify defendant that it intended to hold defendant to that

26

deadline, plaintiff waived right to terminate the contract for defendant's failure to timely
perform).

GT argues that Dominion was at all times obliged to meet the deadlines enunciated in the
Agreement as there was never any additional consideration provided by Dominion to modify the
terms of the parties' contract. (Doc. 114 at 9; Doc. 116 at 4-5). In support of its contention that
the Agreement was not modified, GT relies on the proposition that "for a verbal agreement to
have the effect of altering or modifying the terms of a prior written contract, it must be a valid
and binding contract itself, resting upon some new and distinct consideration." (*Id.*) (citing
*Wells Fargo Bank, N.A. v. Baldwin*, No. CA 2011-12-227, 2012 WL 3064495, at *2 (Ohio Ct.
App. July 30, 2012)). GT contends that because Dominion never offered additional
consideration but only promised to do the acts original promised in the Agreement, that any
arguable modification to the Agreement's deadline fails for lack of consideration.

GT's argument fails because under Ohio law "[s]ubsequent acts and agreements may
modify the terms of a contract, and unless otherwise specified, neither consideration nor a
writing is necessary." *Smaldino v. Larsick*, 630 N.E.2d 408, 412 (Ohio Ct. App. 1993) (citing
*Software Clearing House v. Intrak, Inc.*, 583 N.E.2d 1056, 1061 (Ohio Ct. App. 1990)). "A
continued, different, 'course of performance' between parties manifests a modification of the
original agreement." *Automated Solutions Corp. v. Parqagon Data Sys., Inc.*, 856 N.E.2d 1008,
1016 (Ohio Ct. App. 2006) (internal citations and quotations omitted). Such modifications are
binding where they are acted upon by a party and failing to enforce the modification would result
in injury to the promisee. *Smaldino*, 630 N.E.2d at 412-13 (quoting Restatement 2d, Contracts, §
89) (modifications of contracts are binding "to the extent that justice requires enforcement in
view of the material change of position in reliance on the promise."). *See also Wells Fargo*,

2012 WL 3064495, at *3 (where the parties act upon a modification to an existing contract, even without additional consideration being provided, the modified contract is binding and may not be repudiated). The parties to the Agreement are also "bound toward one another by standards of good faith and fair-dealing." *Bolling v. Clevepak Corp.*, 484 N.E.2d 1367, 1376 (Ohio Ct. App. 1984).

Here, GT continuously and without hesitation represented its intent to perform under the terms of the Agreement despite Dominion's failure to meet the fourth quarter 2010 and first quarter 2011 performance deadlines. At no time did GT insist that Dominion's tardiness was a potential deal-breaker. Rather, even as late as April 6, 2011, GT stated that despite Dominion's inability to fill the Wal-Mart Order, it would continue to work with Dominion and provide purchase orders in the future. It is undisputed that Dominion incurred costs associated with building and installing the bottling line required under the Agreement. *See* Doc. 111, ¶ 4. Prior to its April 18, 2011 letter terminating the agreement, GT never complained about the delays in installing the line even beyond the expiration dates.

The conduct of GT establishes that it implicitly modified the Agreement's timing provision by engaging in ongoing negotiations with Dominion and reaffirming its commitments to perform under the Agreement despite the delays experienced by Dominion. Dominion relied on GT's assent to the delays in continuing to work to have the bottling line installed. GT thus remained bound by the Agreement and it was not permitted to repudiate due to Dominion's failure to meet the originally contemplated timelines.

If GT believed that Dominion breached the Agreement by failing to meet the contemplated timelines for installation of the bottling line, then it should have made that position clear as soon as the initial deadline passed. *Turner*, 2010 WL 2076808, at *2. GT did not do so;

28

rather, GT continued to negotiate with Dominion such that Dominion was reasonably lulled into believing that strict compliance with the performance deadlines was not necessary. Such conduct constitutes an implied waiver by GT of the Agreement's timing provision. *See Sandler*, 954 F.2d at 385. Accordingly, it was incumbent upon GT to first demand performance from Dominion and to give Dominion a reasonable amount of time to perform prior to cancelling the Agreement. *Lang*, 1926 WL 2890. GT did neither and opted to issue a letter on April 18, 2011, cancelling the Agreement. As Dominion had not breached its obligations under the Agreement at that time, GT's cancellation letter – a clear and overt communication of its intent to not perform under the Agreement – constitutes a repudiation of the parties' contract. Consequently, unless the Court finds that Dominion breached the Agreement by refusing to complete the Wal-Mart Order, GT is liable for damages incurred by Dominion in reliance on GT's contractual promises.[11]

          3. *Whether Dominion Breached the Agreement by Refusing to Fulfill the Wal-Mart Order.*

GT argues that despite the issues of timing of performance, it cannot be held liable for repudiation as Dominion breached the Agreement by refusing to produce the Wal-Mart Order when it was capable of doing so. (Doc. 114 at 8-9; Doc. 116 at 2). To support its assertion that Dominion was capable of filling the Wal-Mart Order but refused for economic reasons, GT cites to the following excerpt from Mr. Cain's deposition testimony:

> I could have – I could have shipped them product the day the front end was installed.

---

[11] GT asserts Dominion's motion for summary judgment must be denied because Dominion cites to facts in dispute, such as GT's financial ability to finance orders or to provide Dominion with packing materials. *See* Doc. 116 at 3-4. However, these are not material facts which are necessary to the resolution of Dominion's repudiation claim on summary judgment motions.

\* \* \* \* \*

Q. – is that correct? Okay. And now let's go to the first quarter of 2011. Your
packaging line was not ready in the first quarter of 2011, was it?
A. Yes.
Q. Was it?
A. Yeah.
Q. When was it ready?
A. The front end was ready the first of January.
Q. the front end was ready the first of January --
Q. The front end was ready the first of January --
A. We could have produced. We talked about that earlier.

\* \* \* \* \*

Q. But you went so far as to say that it's complete and operational, right?
A. Isn't this great? Yes, this is good. Notice this, I had forgotten about this
email, January 21st, the front end of the line is installed and we effectively have
the ability to make the product now. That's perfect.

(Doc. 55 at 69:3-5; 164:18-165:6; 254:3-9). GT also cites to the January 21, 2011 email

referenced in Mr. Cain's testimony to support its contention that Dominion had the capability of

filling the Wal-Mart Order. *See* Doc. 111, Ex. B at PAGEID # 3622. The email from Mr. Cain

to Bob Weiss and other GT employees provides, in pertinent part:

> We are completely on the same page. We fully intend to shrink the six packs and
> have registered film capabilities. The problem we have is getting the packaging
> machine from China. We continue to encounter delay after delay. I am told the
> machine is complete and operational. It should just be a matter of shipping and
> installation.
>
> I was looking at the possibility of the six pack holders for the month of February
> only so that we could start producing in the next couple of weeks. The front end
> of the line is installed and we effectively have the ability to make the product
> now.

(*Id*.). GT maintains that the above evidence demonstrates that Dominion could have filled the

Wal-Mart Order but did not because "[i]t wouldn't have been economical." (Doc. 116 at 2,

citing Doc. 55 at 107:20).

GT's selective citation to the evidence fails to capture the complete communications between the parties and does not demonstrate that Dominion "refused" to produce the Wal-Mart Order. The January 21, 2011 email from Mr. Cain wherein he stated that Dominion could effectively make GT's product includes significant details omitted by GT. The communication was initiated by Dominion employee Don Barnhart who requested information from GT regarding "the six pack carrier" based on Mr. Cain's preference for having the option of packing GT's product in a six pack carrier "in case of customer preference *or mechanical problems.*" (Doc. 111, Ex. B at PAGEID # 3623) (emphasis added). GT and Bob Weiss responded that they "really want to move towards the shrink wrap as opposed to the six pack holders [because t]he six pack holders are very expensive. . . ." (*Id*.). Mr. Cain replied that he understood this but that due to ongoing problems in getting the packaging machine from China, he was "looking at the possibility of the six pack holders for the month of February only so that [Dominion] could start producing in the next couple of weeks." (*Id*. at PAGEID # 3622). GT's Bob Weiss responded that the bottles were to be "bulk pack loose. . . ." (*Id*.). Considering this communication in its entirety, it is clear that Dominion represented that it would be capable of completing orders *provided* that the bottles could be packages with six pack holders and that it was not capable of shrink wrapping bottles in bulk due to delays in receiving the packaging component of the bottling line. GT clearly communicated that this was not its preference and that the bottles were to be loosely bulk packed in film, and that Dominion "should expect to start running orders for us in four weeks. . . ." (Doc. 111, Ex. B at PAGEID# 3652. This evidence does not establish that Dominion breached the Agreement by refusing to fill the Wal-Mart Order.

GT similarly cites to only a portion of Mr. Cain's testimony to support its assertion that Dominion breached the Agreement. However, the testimony in full context is consistent with the

31

parties' understanding as expressed in the January 21, 2011 email. Mr. Cain testified that, consistent with his January 21, 2011 representation, Dominion was only able to produce at the "front end," which is where the product is put into bottles and capped, at the time the Wal-Mart Order came in. (Doc. 55 at 68:10-69:16). However, Mr. Cain explicitly testified that Dominion did not have a fully operational line at that time and that it could not have shipped 20,000 12-pack cases per day as envisioned by the Agreement. (*Id.*). Mr. Cain further testified that Dominion could have produced the product for GT "in such a pinch" but that "[i]t would not have been a pretty sight from a manufacturing perspective" as it would have had to use manual processes but that this "wasn't necessary because [GT] had [its] other manufacturers." (*Id.* at 65:1-24). Mr. Cain testified that for the volumes needed by GT, it was necessary to have the "back end" of the line operating at full capacity. (*Id.* at 69:14-16). Though Mr. Cain stated that Dominion would have done what was necessary to get GT product had GT insisted, including manually packaging it, he testified that no such demand was made. (*Id.* at 65: 1-10, 69:18-20). As Mr. Cain testified, GT never asserted that Dominion was in breach but "continued to give [him] positive updates and tell [him to] just get the line ready and [GT will] give [Dominion] purchase orders for months." (*Id.* at 165: 22-25).

Mr. Cain's undisputed testimony when read in its full context does not reflect, as GT maintains, that Dominion was capable of filling the Wal-Mart Order but refused to do so out of its own monetary concerns. To the contrary, the testimony reveals that Dominion would have gone to great lengths to fill the Wal-Mart Order had only GT requested as much. But GT did not demand performance; it simply reiterated that it understood the delays in getting the line fully operational and that it would provide future purchase orders despite Dominion's inability to fill the Wal-Mart Order. *See* Doc. 111, Ex. B. at PAGEID # 3645, 3672. The facts simply do not

support GT's assertion that Dominion breached the Agreement before GT issued its April 18, 2011 cancellation letter. Consequently, GT's cancellation constitutes an anticipatory repudiation of its obligations under the Agreement.

## V. Conclusion

For the reasons stated above, the Court finds that GT's April 18, 2011 cancellation letter was an anticipatory repudiation of the Agreement and that Dominion is entitled to reliance damages for this breach as a matter of law. Dominion's partial motion for summary judgment on its contract repudiation claim (Doc. 113) is **GRANTED**, and GT's partial motion for summary judgment seeking summary judgment (Doc. 114) against Dominion on its contract repudiation claim is **DENIED**. The parties' previously submitted motions for summary judgment (Docs. 85, 86, 87) are **DENIED** as moot. This matter is hereby set for a telephone status conference on **Thursday, March 27, 2014 at 2:00 p.m.** for purposes of setting a trial date on Dominion's reliance damages claim.

**IT IS SO ORDERED.**

Date: 3/14/14

Karen L. Litkovitz
United States Magistrate Judge

33